Filed 4/22/15  In re Eli A. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ELI A., a Person Coming Under the Juvenile Court Law. | B258506 (Los Angeles County Super. Ct. No. CK77446) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DARWIN A.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

―――――

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

―――――

Father Darwin A. appeals from the order terminating his parental rights over his son Eli A. Father contends that the juvenile court erred by terminating parental rights because the parent-child relationship exception to termination in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i)[1] applies in this case. We disagree and thus affirm the order.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

1.    *The First Section 300 Petition*

In May 2009, when Eli was seven months old, the Department of Children and Family Services (DCFS) filed a section 300 petition against mother and father based on domestic violence between the parents. The juvenile court released Eli to mother. It granted father monitored visitation in a neutral setting and issued a restraining order requiring father to stay at least 100 yards away from mother and Eli. In July 2009, the court declared Eli a dependent of the court, continued his placement with mother under DCFS supervision, ordered family maintenance services for mother and family reunification services for father, granted father monitored visitation and required father to participate in various programs, including domestic violence and anger management counseling. Mother and Eli lived with the maternal grandmother. For the next year, father visited Eli sporadically but did not comply with the case plan. In July 2010, the court terminated jurisdiction with a custody order giving mother and father joint legal custody of Eli and sole physical custody of Eli to mother. Father was awarded monitored visitation.

---

[1]    Statutory references are to the Welfare and Institutions Code.

[2]    Father also has a daughter Ali A., who is Eli's younger sister. The juvenile court terminated father's parental rights as to Ali as well as Eli. Father appeals the termination only with respect to Eli and does not argue that termination was improper for Ali. Ali thus is not at issue in this appeal. The court also terminated mother's parental rights of both children. Mother did not appeal.

2.      *The Second Section 300 Petition*

Several months later, in November 2010, DCFS received a referral alleging neglect by mother of her and father's newborn, Ali. Mother reportedly had tested positive for marijuana after giving birth. DCFS determined that mother lived with father, not in the maternal grandmother's home, as mother had moved in with father when the prior dependency case closed. Mother agreed to return to live at the maternal grandmother's home with Eli and Ali while the matter was investigated. Over the next couple months, DCFS attempted but was unsuccessful in reaching father. After finally reaching him by telephone, father agreed to meet the social worker the following day but did not show. About a week later, DCFS learned from the maternal aunt that mother was living with father at his apartment. That same day, father reported that he had been arrested for domestic violence against mother, and a restraining order required him to stay 100 yards away from mother and the children. Father said mother had been living with him and would hide when DCFS came to the apartment. The police report indicated that, during an argument, father had punched, pushed and choked mother while the children, Eli then two and Ali then two months, were in the apartment.

In February 2011, the children were taken into protective custody, and DCFS filed another section 300 petition, again relating to domestic violence between the parents as well as mother's marijuana use. The children were initially detained in shelter care but then placed with the maternal grandmother. Although the court had ordered monitored visits of two to three times per week with the children, father had difficulty arranging visits and had only two visits between detention and May 2011. Father also attempted to find mother at her apartment. On May 17, the juvenile court declared the children dependents of the court based on domestic violence and mother's marijuana use, ordered family reunification services for mother and father and monitored visitation of two to three times a week in a neutral setting. About a week later, father was again arrested, this time on an outstanding warrant. And he was arrested on June 15 for violating the restraining order.

Over the next six months father did not visit the children within the parameters of his monitored visitation but rather attempted to secure visits through the maternal grandmother. DCFS removed the maternal grandmother as a monitor of father's visits. Nevertheless, father continued to show up at her house and demand to see the children. Mother was not in compliance with her case plan, and father called the maternal grandmother and the maternal aunt looking for mother. He did not often speak to Eli during these calls, and when he did he would ask the child where he could find mother. On one occasion, father attempted to take Ali while she was at church with the maternal aunt but returned her; father called the incident a misunderstanding and said he was not trying to take the child away.

Father resumed visitation in late 2011 and had three visits with the children. A written visitation and telephone schedule was made at the end of January 2012, providing for monitored visits of one hour on Mondays and telephone calls daily at 8:00 a.m. and 8:00 p.m. Father was sporadic in visiting. On February 16, mother and father were arrested based on what father reported as a verbal argument. In March, the juvenile court increased father's monitored visits to two to three times per week for two to three hours each visit and ordered DCFS to prepare a written schedule. In May, after two continuances of the six-month review hearing to give the parents additional time for compliance, the court terminated mother's and father's family reunification services, finding them in only partial compliance with their case plans, and set the matter for a section 366.26 hearing.

The September 2012 report prepared in connection with the section 366.26 hearing reported that the maternal grandmother was the prospective adoptive parent and that the children were doing well in her care. Father did not visit with the children over the summer months. Father complained to the social worker in two voicemail messages about not seeing his children. DCFS left father return messages telling him to contact the social worker and maternal grandmother was willing to monitor his visits again. Father did not respond to the social worker. In October the maternal grandmother was approved as an adoptive parent. She reported that father had been stopping by the house to see the

4

children. Father told Eli he had to do only what father said. The social worker left a voicemail message for father instructing him based on these incidents not to contact the maternal grandmother for visits. DCFS recommended termination of parental rights for mother and father.

On October 24, father filed a section 388 petition requesting that the juvenile court reinstate his family reunification services or, alternatively, order a legal guardianship rather than adoption. The court ordered a hearing on the petition for December 19. In the meantime, although DCFS and father discussed a visitation schedule, one was not confirmed. The section 388 hearing was continued to January 24, 2013. Father had missed two visits on December 12 and 19, but, because he had completed his court-ordered programs, DCFS recommended granting the section 388 petition and reinstating family reunification services. The court did just that. It ordered monitored visitation. DCFS permitted father weekend visits to be monitored by his girlfriend, who lived with him, or the paternal aunt.

On February 2, 2013, father picked up the children for a weekend visit from the maternal grandmother's home while mother was present. He did not have car seats for the children, but took them in the car without car seats, against the advisement of the maternal aunt and mother. Father told the social worker to keep secret the fact that he had taken the children in the car without car seats. He also showed the social worker naked pictures he had taken of the children during the weekend visit. The children were showering together, and father had taken more than 100 naked pictures of them. Mother and the maternal aunt reported that father had posted naked pictures of the children on Facebook. Father resumed monitored visits with the children at the DCFS office and was consistent with his visits. He participated in programs, but did not submit to about half of his required drug and alcohol testing.

DCFS liberalized father's visits to unmonitored in July 2013. Father often showed up late for the exchange of the children with the maternal grandmother, and the exchange place was changed from the maternal grandmother's home to a local police station. When father was late for an exchange at the police station on one occasion, he went to the

maternal grandmother's home. DCFS received a referral that father had permitted Eli to drink beer during an unmonitored weekend visit. Eli said he had drunk beer at a party. Father's girlfriend stopped living with him around October 2013, and father reported that he had allowed mother to have breakfast with the children during his unmonitored visit, even though he was not permitted to monitor mother's visits. On October 21, DCFS again required father's visits to be monitored.

After several continuances, father's six-month review hearing was held on January 30, 2014. Father did not attend. The children's counsel as well as mother's counsel recommended termination of father's reinstated family reunification services, which had been in effect for one year. The juvenile court terminated reunification services. It stated, "mother and father have had a volatile, negative and toxic relationship. Father was partially in compliance with the orders and with visits. Father even admitted, as reflected in the last minute, that he allowed mother to have essentially unmonitored visits which were against the court's order. And there's some suggestion and allegations that father is not taking good care of the two year old [Ali]. There's also an allegation, which father's not here to refute, that he allowed the four year old [Eli] or while the four year old was under his care and custody, the four year old imbibed some alcohol. . . . [F]ather was granted [family reunification] pursuant to 388. And what amounts to about 12 months time, he has not complied with the court orders. To the extent that all he was ordered to do was random drug tests, he's missed some random drug tests, that might be stating it charitably. And it does appear that his judgment is such where he's continued to put the children in jeopardy. Not just encounters with the mother, which has been prohibited generally, and [DCFS] does detail that lack of judgment." The court thus terminated father's reinstated family reunification services and set the matter for a section 366.26 hearing.[3]

The May 29 report, prepared for the section 366.26 hearing, identified the maternal grandmother as the prospective adoptive parent and noted the children were

---

[3] Father filed another section 388 petition in May 2014, which the juvenile court summarily denied.

doing well in her care. As of time of the report, the children had been in her care for more than three years. Father had weekly monitored visits with the children at DCFS's office, although father canceled several scheduled visits. Father tested positive for marijuana on April 11. DCFS recommended termination of parental rights for mother and father and adoption as the permanent plan. At the May 29 hearing, father requested, and received, a continuance for additional visitation of three times per week instead of once a week, although mother's counsel maintained that father had been permitted visits of three times per week but was not attending all of them. An order was made for visits of three times per week at three hours a visit.

At the continued section 366.26 hearing, on August 18, Eli, who was then almost six years old, testified that he played sports with father during their visits. He would be "sad" if he were not able to visit with father and "really sad" if his dad were not his dad anymore. He felt "really, really, really, really, really[] sad" when his visits with father ended. Eli had arranged for father to attend his kindergarten graduation ceremony. He would be "happy" if he could live with the maternal grandmother and still visit with father. He did not understand the meaning of adoption. Father testified about his visits with the children and said that he had continuously requested more visitation. He had not been able to secure visits of three times a week. He acknowledged that his visits reverted back to monitored, even though they had been liberalized to unmonitored at some point during the proceedings. The maternal grandmother testified that father visited with the children for one hour once a week at the DCFS office but had not visited in the past month. During the last visit that she monitored, she said father played with the children. She testified that the occasions the children had visited with father at his house "the kids when they came back had a different attitude. They came back dirty. They came back hungry. There's nobody that can be—let's say for instance [father's] attitude is very different, and he makes problems." The children had been in maternal grandmother's care for more than three years, and she was willing to adopt them. Although not what she wanted, she would allow the children to visit with father for "the good of the kids." She also would allow contact with mother.

7

DCFS, mother's counsel and the children's counsel all argued for terminating parental rights and proceeding with adoption by the maternal grandmother. Father argued against terminating his parental rights based on the parent-child relationship exception to termination. The juvenile court found that the exception did not apply and terminated mother's and father's parental rights.

Addressing father, the court stated, "The court finds that the arguments made by county counsel, minors' counsel, mother's counsel were more compelling in this case. The father has had—been—clearly the mother and father have had a volatile, a negative, somewhat toxic relationship which the father's indicated he was hoping to remedy, but that is just a part of the history here. Mother concedes the issue of terminating parental rights. So I'll address the issue more as to father as opposed to mother. But during the pendency of this proceeding[,] which was based on a petition that was filed on February 14, 2011, the history is such where father was in partial compliance with the court's orders and visits for a period of time. There was some allegation that he even allowed [Eli] to consume alcohol. He allowed mother when the children were in his care to have unmonitored visits. There were issues of father not enrolling in a drug counseling program. There was some issues of father in the proper care he was taking of the then two-year old who was soiling herself. Those are some of the atmospherics. The allegations involve general neglect, emotional abuse, domestic violence, and drug abuse—some of this of course on mother's side. Father was granted family reunification services per a 388 earlier on, . . . [a]nd the argument that county counsel put forward then was that he continued to put the children in jeopardy with his encounters with the mother."

The juvenile court continued, "father . . . has had opportunities, and he hasn't adequately availed himself of those opportunities. I find that based on what I've heard about father's visits that he has been a friendly father. He's been a friendly playmate with the children. I don't find that the father's met the exception . . . . Father's parental role appears to be absent. . . . I do find that it's in the best interest of these minors to lead to the kind of permanency and finality that a 26 proceeding requires. I do grant that the

8

minors do have a relationship with this father, and everyone's conceded that, but it's not clear that the minors will benefit by continuing that relationship. The father may, very well will, but it's not clear to me at this age that the minors will given that they have been in their present placement for nearly four years; for the youngest child almost the entirety of her years. Father's contact has to be meaningful contact and has to be meaningful contact with someone who's standing in the parental role . . . . The contact must be frequent and of high-quality and not the parent as a play partner. These minors do need permanence. . . . I don't find that the father has fulfilled his parental role. I do not find that he was fulfilling his parental role when he had unmonitored visits. In fact, his visits were reverted back to monitored as a result. . . . I do feel that father hasn't met the high burden. The visits do confer some benefit. He may have a positive relationship with his children, but the incidental benefit and what benefit inures to him is not what has to motivate this court. What has to motivate this court is what's in the best interest of the children, and I weigh benefits of permanency and finality for the minors. And I find that these minors do deserve the stability which they do appear to have with the prospective adoptive parent[]."

## DISCUSSION

"At a hearing under section 366.26, the [juvenile] court must select and implement a permanent plan for a dependent child." (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) The express purpose of a section 366.26 hearing is "to provide stable, permanent homes for [dependent] children." (§ 366.26, subd. (b).) "Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. [Citation.]" (*In re K.P.*, at p. 620.) "If the court determines . . . , by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. . . . A finding . . . that the court has continued to remove the child from the custody of the parent . . . and has terminated reunification services[] shall constitute a sufficient basis for termination of parental rights. Under these circumstances, the court shall terminate parental rights unless [a statutory exception to termination applies]." (§ 366.26, subd. (c)(1); see *In re K.P.*, at p. 620 ["in the absence of evidence

9

that termination of parental rights would be detrimental to the child under statutorily specified exceptions [citations], the juvenile court 'shall terminate parental rights'"].)

The question in this case is not adoptability but rather whether father satisfied the parent-child relationship exception to termination in section 366.26, subdivision (c)(1)(B)(i), which requires that he prove that he has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) The "benefit" prong of the exception, "[i]n the context of the dependency scheme prescribed by the Legislature," concerns whether "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) It also requires a significant relationship that rises above incidental affection and care. "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's need for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid.*)

Frequent and loving contact between a child and parent is not sufficient, by itself, to establish the significant parent-child relationship required by the exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; see, e.g., *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 ["'warm affectionate relationship'" between father and son, where son called father "daddy," did not outweigh potential benefit of adoption]; *In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827 ["emotional bond" and enjoyable visits between father and son insufficient when relationship bore "no resemblance to the sort of consistent, daily nurturing that marks a parental relationship"].) In other words, "a *parental* relationship is necessary for the exception to apply, not merely a friendly or

10

familiar one. [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; see also *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108 ["parents must show that they occupy 'a parental role' in the child's life," not only "'frequent and loving contact,'" "an emotional bond with the child, or that the parents and child find their visits pleasant"].) "'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re. K.P.*, *supra*, 203 Cal.App.4th 614, 621.)

A review of the case facts demonstrates that father did not establish that he had a parental relationship with his son based on consistent visitation such that the parent-child relationship exception to termination would apply. The dependency proceedings were quite lengthy. During some of the time, father maintained regular contact with Eli; other times, however, father did not. Father did not visit with the child even in the month before the section 366.26 hearing, despite having opportunity to do so. Moreover, although Eli enjoyed spending time with father and would be sad if he did not, no evidence showed that father occupied a parental role in Eli's life. They played sports together during visits, and Eli arranged for father to attend his kindergarten graduation ceremony, but father did not care for Eli in a parental capacity. On the contrary, when father was granted liberalized visits with Eli and able to take him for the weekend, he permitted Eli to be driven without a car seat and to have beer and allowed an unmonitored visit with mother, despite the volatile relationship between mother and father, acts which led again to more restricted visits. Father also testified positive for marijuana in the period before the section 366.26 hearing, although he knew he was being monitored, and was unable to use the time during which he was afforded further reunification services to establish a parental bond with Eli. Unlike the case of *In re Amber M.* (2002) 103 Cal.App.4th 681, 690-691, on which father relies, in which the evidence supported a parental relationship between mother and the children based on their primary attachment with her and on a psychological bonding study and one of the children's therapists, the facts here do not show a parental bond between father and Eli,

11

and Eli's therapist found Eli was doing well in the care of the maternal grandmother, where he had lived for more than three of his almost six years, and "'could not be in a better place.'" The juvenile court thus did not err by terminating father's parental rights over Eli.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


JOHNSON, J.

12